[No. 37122-7-II. Division Two. May 12, 2009.]

THE STATE OF WASHINGTON, *Respondent*, v. JESSE WILLIAM POWELL, *Appellant*.

*Susan F. Wilk* (of *Washington Appellate Project*), for appellant.

*Russell D. Hauge, Prosecuting Attorney,* and *Randall A. Sutton, Deputy,* for respondent.

¶1 HUNT, J. — Jesse William Powell appeals his second degree rape jury conviction, under RCW 9A.44.050(1)(b), for engaging in sexual intercourse with another person when the victim was incapable of consent by reason of being physically helpless or mentally incapacitated. He argues that he received ineffective assistance from his trial counsel, who failed to propose a jury instruction on the "reasonable belief" defense, RCW 9A.44.030(1).[1] Following *In re Personal Restraint of Hubert*, 138 Wn. App. 924, 158 P.3d 1282 (2007), we hold that the lack of a "reasonable belief" instruction prejudiced Powell's defense, we reverse, and we remand for a new trial.[2]

## FACTS

### I. INCIDENT

¶2 In the afternoon of August 11, 2007, PLM[3] took a ferry from Bremerton to Seattle to go out with a friend, whom she met in Pioneer Square. The pair spent the rest of the day together visiting friends, eating, smoking marijuana, and drinking. Around midnight, PLM left her friend and headed back to the ferry terminal to catch the last ferry back to Bremerton.

¶3 On her way to the ferry terminal, she called friends and arranged for them to pick her up when the ferry arrived in Bremerton. At that point, PLM knew she was drunk, but she was aware of where she was and she was able to walk and to carry on a conversation, although she might have been slurring her words. The last thing PLM recalled clearly was being across the street from the ferry terminal.

---

[1] RCW 9A.44.030(1) provides a defense to second degree rape if the defendant can prove by a preponderance of the evidence that he reasonably believed the victim was not mentally incapacitated and/or physically helpless at the time of the offense.

[2] We relate the facts and argument pertinent to Powell's speedy trial argument in the later, unpublished portion of this opinion.

[3] We refer to the victim by her initials in order to protect her privacy interests. We mean no disrespect.

She believed that she got on the ferry alone.[4] According to PLM, although she drank occasionally and had been drunk before, she did not drink often; her alcohol tolerance was "pretty low"; she had never blacked out before; and, because she was openly gay, she would never have gone home with a man.

¶4 After boarding the ferry, the next thing PLM knew, she woke up in a motel room without her shoes, pants, or underwear on; a naked man, Jesse Powell, was performing oral sex on her. PLM was extremely frightened; she had no idea where she was, how she had gotten there, who Powell was, what his intentions were, or whether he had any weapons. So PLM "kind of went along with" the situation to gain his trust and to give herself time to figure out a way to get him out of the room. She did not resist Powell's continuing oral sex for 15 to 20 minutes; acted as if she were enjoying it and wanted him to continue; allowed Powell to attempt intercourse with her; and, at one point, got on top of him to facilitate his attempt at intercourse, which was ultimately unsuccessful.

¶5 Eventually, after some coaxing, PLM was able to persuade Powell to leave the room to get her some ice. PLM then locked the door; dressed; grabbed her belongings, including Powell's military identification tags; and ran out of the room. Believing that Powell had probably gone downstairs for the ice, she ran upstairs to give herself time to figure out where she was. PLM encountered a man smoking outside his room, who asked if she was okay. At this point, PLM "pretty much just lost it." The man took her to the motel office, where the motel owner called the police.

¶6 PLM spoke to the police, who arrested Powell, and sent PLM by ambulance to the hospital. At the hospital, a nurse examined PLM. A physical examination report noted injuries that could have been the result of "rather vigorous, rather extended oral sex being performed on" PLM. PLM

---

[4] PLM's friends attempted to pick her up as arranged; they waited for her at the Bremerton ferry terminal until 3:00 AM, but they did not find her.

told the nurse that she had had four drinks at a café that night.[5] Although PLM did not recall having used methamphetamine that night, a urinalysis found evidence of methamphetamine in her urine sample. PLM later said she was unsure whether she had engaged in additional drug use that evening because she had "some gaps in [her] memory."[6]

## II. Procedure

¶7  The State charged Powell with third degree rape. The State later amended the charge to second degree rape or, in the alternative, third degree rape.

### A. State's Case in Chief

¶8  At Powell's jury trial, the State presented testimony from (1) PLM, who testified as set forth above; (2) Joleen Culbertson, a sexual assault nurse examiner and coordinator of the sexual assault nurse program at Harrison Medical Center, who testified about the examining nurse's report as set forth above; (3) Suk James, the motel owner; (4) Detective Ken Butler of the Bremerton Police Department; and (5) Trooper Cadet Jesse Sizemore of the Washington State Patrol.[7]

### 1. Suk James

¶9  Suk James, owner of the Dunes Motel in Bremerton, testified that at about 2:30 AM, on August 12, Powell and PLM arrived at the motel, and Powell requested a room. Powell, who did not appear to be attempting to conceal his identity, filled out the registration using his true name and

---

[5] PLM later testified at trial that she estimated she had had eight to ten alcoholic drinks that night after 8:00 or 9:00 PM.

[6] According to PLM, she usually took Zoloft by prescription, but she had not taken her prescription medication on the day of the rape.

[7] Sarah Swenson, a forensic toxicologist at the Washington State Toxicology Laboratory, also testified for the State, but her testimony is not relevant to the issues on appeal.

gave James a passport as identification. Powell had his arm around PLM's waist or shoulders; Powell repeatedly told James that PLM was his wife and that PLM was pretty. James stated that PLM (1) was walking when she entered the motel's office, (2) did not have any trouble standing, (3) did not appear to be drunk, and (4) did not smell of alcohol. PLM did not, however, respond when James greeted her. She did not move her eyes while she was in the office. Instead, she just stood there "like a zombie or something," not moving or talking. James assumed that the couple had been arguing and that the woman was upset.

¶10 James gave Powell a room key. Powell and PLM walked out of the office, with Powell holding PLM's hand. About 30 minutes later, Powell returned to the office and told James that his "wife" wanted some ice. James gave him some ice, and Powell left the office.

¶11 About five minutes later, another man who was staying in the motel arrived at the office with PLM. When James opened the office door, PLM ran in, upset and crying. James testified that at this point, (1) PLM smelled of alcohol, but James was still not sure that PLM was drunk; (2) PLM looked scared and nervous, was shaking and crying, and did not appear to know where she was; and (3) PLM stated she did not know why she was there. James called the police.

## 2. Detective Ken Butler

¶12 When Detective Butler responded to the Dunes Motel at about 3:30 AM on August 12, PLM was already at the hospital, and Powell was in the back seat of a patrol car. After talking to the lead officer, Butler spoke with Powell, who had apparently asked to talk to a detective. When Butler opened the car door and identified himself as a detective, Powell immediately informed Butler that the sex was consensual.

¶13 When Butler asked Powell for permission to search the motel room, Powell responded, " 'I was hoping that you

would ask me that. I want you to go into the room.' " Report of Proceedings (RP) (Nov. 8, 2007) at 41. Powell agreed to sign a consent to search form. Butler did not find any luggage or personal belongings in the motel room, but the bed was messed up and there was an ice bucket in the bathtub. Powell also consented to having DNA (deoxyribonucleic acid) swabs taken from him.

¶14 After Butler returned to the police station with Powell and advised him of his *Miranda*[8] rights, Butler interviewed him. Butler could tell that Powell had been drinking, but he did not ask Powell about that. Powell again told Butler that the sex was consensual. Powell explained that (1) he did not know PLM before that night; (2) he had met PLM at the Seattle ferry terminal, when he noticed two ferry personnel talking to her because she was so incapacitated and told the ferry personnel that he would "take her and help her"; (3) when they got off the ferry in Bremerton, they took a taxi to the motel; and (4) PLM took off her own pants and underwear when they got to the motel room and was a willing participant in the sexual activity. According to Butler, Powell said several times that PLM had been "very, very incapacitated."[9]

### 3. Trooper Cadet Jesse Sizemore

¶15 Trooper Sizemore testified that on the night of the incident, he had been working at the Seattle ferry terminal and had noticed PLM on a bench, alone and apparently intoxicated. He saw PLM again as the ferry was loading; she was bumping into the turnstile trying to get it to turn. When Sizemore approached her and told her that she needed a ticket before she could get through the turnstile, PLM turned to face Sizemore, but she did not speak to him.

---

[8] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[9] Powell, however, denied having made this statement to Butler and asserted that even though he had signed the "statement" that Butler presented to him, this statement was not what he had said to Butler.

¶16 As Sizemore attempted to explain to PLM how to use the turnstile, Powell ran up to them, announced that he had the tickets, and told Sizemore that PLM was Russian and that she did not speak English. Sizemore had no reason to doubt Powell, to suspect that Powell and PLM were not together, or to believe that PLM was too drunk to board the ferry. So Sizemore told them to get on the ferry because it was the last one that night. Powell and PLM then used Powell's tickets to pass through the turnstiles, and they boarded the ferry.

¶17 Sizemore further testified that the turnstiles in the ferry terminal were new and that the ferry passengers were still getting used to them. He stated that even sober people frequently had trouble using the turnstiles because they did not realize that they had to swipe a ticket to get through.

## B. Defense Case

¶18 Powell was the only defense witness. He testified that at the time of his encounter with PLM, he had been staying in Bremerton with his sister and had gone to Seattle that evening to visit some Russians at a Seattle nightclub.[10] After having four beers at the nightclub, he returned to the ferry terminal to catch the 12:50 AM ferry back to Bremerton.

¶19 When he arrived at the terminal, he purchased his ticket and went into the waiting area, where he noticed three Washington State Patrol officers approach PLM. He reached PLM at the same time as the officers. He did not know PLM before that night. PLM seemed to be intoxicated, and the officers appeared to be concerned.

¶20 When he heard the officers ask PLM if she needed assistance, Powell was concerned that the officers would take her "to detox," so he decided to tell the officers that he and the woman were Russian, that she was his wife, and

---

[10] Powell, a former member of the Washington Army National Guard, explained that he was interested in Russian culture and history.

that she did not speak English. Powell stated that (1) he had "hinted" to PLM that he was attempting to help her out, and (2) he believed she had "caught the hint" because she looked at him and grinned and then looked at the officers and nodded her head "yes" without saying anything. The officers then asked Powell for their tickets. Powell had only one ticket, so the officers directed him to get another ticket for PLM. Powell purchased a ticket for her and boarded the ferry with her.

¶21  On the ferry, Powell took a nap. He was surprised to find that PLM was still with him when he woke up as the ferry was docking in Bremerton. When he and PLM got off the ferry, he told her he was taking a cab and offered her a free ride. He also told her that he was going to a motel for the night and that she was welcome to join him. He testified that (1) he did not go home and leave PLM on her own to find her way home because he was not sure whether she could get home from where they were; (2) PLM never said that she wanted to go home; (3) he did not know how much PLM had had to drink that night and did not ask her if she had been drinking; (4) he did not suspect that she had taken any drugs; and (5) he had intended to help her get home in the morning.

¶22  At the motel, Powell told James that PLM was his wife because he did not want James to think that he was getting a room with a prostitute. Powell admitted that he had remarked to James that PLM was beautiful, but he denied having repeated this statement. Powell testified that (1) he told James that he and PLM had just come from Russia and that friends would pick them up in the morning; and (2) he gave James his local address and his Washington identification card to photocopy.

¶23  According to Powell, after they went into the motel room, PLM sat on the bed and took off her shoes. He then stripped down to a t-shirt and a pair of shorts that he was wearing under his clothes, and he put his ring, watch, and military identification tags on the nightstand. After a few minutes, he told PLM that he "would like to massage her"

and brushed her beltline with his fingers; she appeared to understand that he wanted to perform oral sex on her, agreed, and smiled. She then helped him take off her pants and panties. As she sat on the bed, he started to perform oral sex on her. She seemed to enjoy what he was doing for about 30 minutes, she responded yes to his suggestions, she willingly repositioned herself on the bed to make them both more comfortable when he suggested it, and she responded as if she were enjoying what he was doing.

¶24 Powell further testified that, at one point, PLM asked him to place his fingers inside her, but he did not comply because he thought that this was "disgusting." Instead, he offered to have intercourse with her, but he was unable to do so because he did not have an erection. Eventually, they agreed that she would try to help by getting on top of him. PLM suggested that Powell get some ice to make the sex more stimulating.

¶25 When he returned with the ice, PLM was gone. When Powell met the police in the motel lobby, they informed him that he was being accused of rape, and he asked to speak to a detective so he would be able to help the police collect evidence that would help him.

¶26 According to Powell, (1) PLM did not appear too impaired or intoxicated to participate in the sexual activity willingly; (2) he did not see anything that indicated to him that PLM was not a willing participant; (3) PLM never told him to stop; (4) based on the sounds PLM made during the sexual contact and her later demeanor, he thought she was happy with the situation; and (5) PLM did not do or say anything that caused him to think that she was too intoxicated or impaired to decide whether she wanted to have sex with him.

¶27 Powell denied having planned to have sex with PLM when he first stopped to assist her at the Seattle ferry terminal. But he admitted that he had assumed she had been drinking that night. Powell asserted that he had concluded that PLM was intoxicated solely because it was a Saturday night, PLM was young and pretty, and people went

to Seattle to enjoy the nightlife. He stated that PLM did not do or say anything to make him think that she was drunk, that it was just conjecture on his part, and that by the time they were in Bremerton, she "did not seem intoxicated."

## C. Jury Instructions

¶28 The trial court instructed the jury:

> A person commits the crime of rape in the second degree when he or she engages in sexual intercourse with another person when the other person is incapable of consent by reason of being physically helpless or mentally incapacitated.

Clerk's Papers (CP) at 27 (Instruction 6). The "to convict instruction," instruction 10, required the jury to find that PLM was "incapable of consent by reason of being physically helpless or mentally incapacitated." CP at 31. The trial court also defined "mental incapacity" and "physical helplessness" as follows:

> Mental incapacity is a condition existing at the time of the offense that prevents a person from understanding the nature or consequences of the act of sexual intercourse whether that condition is produced by illness, defect, the influence of a substance, or by some other cause.
>
> A person is physically helpless when the person is unconscious or for any other reason is physically unable to communicate unwillingness to an act.

CP at 30 (Instruction 9). The record does not reflect that any party proposed a jury instruction on the statutory "reasonable belief" defense.

## D. Closing Arguments

¶29 In closing argument, the State emphasized the evidence that suggested PLM was highly intoxicated and argued that, based on this evidence, it was clear that PLM was incapable of consent and that Powell was aware of her

level of intoxication. More specifically, the State argued that: (1) PLM had admitted she had been drinking and smoking marijuana on the night of the rape; (2) PLM did not remember anything from the time she reached the ferry terminal until she awoke in the motel; (3) Sizemore testified that PLM had appeared intoxicated at the Seattle ferry terminal, that she was having trouble operating the turnstile, and that he was concerned enough about her condition to approach her; (4) PLM did not respond when Sizemore spoke to her; (5) James also noticed that PLM was not talking and that she was not really moving at the motel; (6) Powell did not deny the sexual contact and was very eager to tell a detective that the sexual contact was consensual; (7) at one point, Powell told the detective that PLM had been very, very intoxicated at the ferry terminal; (8) Powell admitted that he was not really able to converse with PLM; and (9) Powell did not tell the detective that he had lied to the staff at the Seattle ferry terminal when he came to PLM's assistance; instead, Powell told the detective only that he (Powell) had offered to help PLM.

¶30 The State also emphasized that the lab reports showed that PLM had a 0.13 alcohol level in her urine and argued that this and the rest of the evidence demonstrated not only that PLM was so incapacitated that she was unable to communicate when she arrived at the motel with Powell, but also that she was also physically helpless. But the State also commented that PLM was so incapacitated that, not only was she unaware of what had happened, but also she could have consented and not remembered doing so. In addition, the State discussed Powell's credibility, highlighting inconsistencies between Powell's statements to Butler and Powell's testimony.

¶31 In his closing, defense counsel argued that the evidence demonstrated that PLM was not physically helpless and that, from Powell's perspective, PLM appeared to be able to consent to the sexual activity. Noting that even the prosecutor had recognized that PLM was so intoxicated that she could have consented and not remembered doing

so, defense counsel emphasized (1) Sizemore's testimony that PLM did not appear to be so intoxicated that she was unable to board the ferry, and (2) James's testimony that PLM did not appear to be intoxicated. Defense counsel also questioned whether Butler's assertion that Powell had told him that PLM was very "incapacitated" was accurate, asking the jury to consider whether it believed that Powell had "used [the] word[ ] incapacitated" or whether this was "a word that the detective used and then attributed to Mr. Powell."

¶32 The jury found Powell guilty of second degree rape. Powell appeals his conviction.

## ANALYSIS

¶33 Powell argues that his trial counsel provided ineffective assistance of counsel in failing to propose a jury instruction based on the "reasonable belief" statutory defense to second degree rape, provided in RCW 9A.44.030(1). The State responds that (1) defense counsel made a reasonable tactical decision to require the State to prove all the elements of the charged offense, including PLM's incapacity, beyond a reasonable doubt, rather than shift the burden to Powell to prove the elements of the affirmative defense; and (2) the absence of a "reasonable belief" instruction did not prejudice Powell because there can be no prejudice "where the jury clearly did not accept his theory that [PLM] was not incapacitated." Br. of Resp't at 15. We agree with Powell.

### A. Standard of Review

¶34 We review an ineffective assistance of counsel claim de novo. *State v. S.M.*, 100 Wn. App. 401, 409, 996 P.2d 1111 (2000). To prove ineffective assistance of counsel, Powell must show both deficient performance and prejudice. *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987).

¶35 Counsel's performance is deficient if it falls below an objective standard of reasonableness. *State v. Stenson*, 132 Wn.2d 668, 705, 940 P.2d 1239 (1997), *cert. denied*, 523 U.S. 1008 (1998). We give great judicial deference to trial counsel's performance and begin our analysis with a strong presumption that counsel was effective. *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). "[G]enerally, legitimate trial strategy cannot serve as the basis for a claim of ineffective assistance of counsel." *In re Pers. Restraint of Hubert*, 138 Wn. App. 924, 928, 158 P.3d 1282 (2007) (citing *State v. Aho*, 137 Wn.2d 736, 745-46, 975 P.2d 512 (1999)).

¶36 Prejudice occurs when, but for the deficient performance, there is a reasonable probability that the outcome would have differed. *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). "A reasonable probability 'is a probability sufficient to undermine confidence in the outcome.'" *Hubert*, 138 Wn. App. at 930 (quoting *Strickland*, 466 U.S. at 694). Such is the case here.

### B. Statutory "Reasonable Belief" Defense

¶37 The State charged Powell with second degree rape by engaging in sexual intercourse with another person who was incapable of consent by reason of being "mentally incapacitated" or "physically helpless." RCW 9A.44.050(1)(b). Our legislature has provided a statutory "reasonable belief" defense to such a charge:

> In any prosecution under this chapter in which lack of consent is based solely upon the victim's mental incapacity or upon the victim's being physically helpless, it is a defense which the defendant must prove by a preponderance of the evidence that *at the time of the offense the defendant reasonably believed that the victim was not mentally incapacitated and/or physically helpless.*

RCW 9A.44.030(1) (emphasis added).

## C. Deficient Performance

### 1. Entitlement to instruction

¶38 A defendant is entitled to a jury instruction supporting his theory of the case if there is substantial evidence in the record supporting his theory. *State v. Washington*, 36 Wn. App. 792, 793, 677 P.2d 786, *review denied*, 101 Wn.2d 1015 (1984). For defense counsel's failure to request the "reasonable belief" instruction to amount to deficient performance, Powell must show that had counsel requested this instruction, the trial court would have given it.

¶39 To warrant a "reasonable belief" instruction, Powell had to present evidence supporting his theory that at the time of the offense, he reasonably believed that PLM was not mentally incapacitated and/or physically helpless. RCW 9A.44.030(1). Powell testified that, based on PLM's conduct, including her nonverbal and verbal reactions to him, he believed she was consenting to the sexual contact with him. None of the other witnesses, who were all State's witnesses, testified that PLM appeared too drunk or otherwise incapacitated to make decisions, even though she did appear somewhat intoxicated to some. Furthermore, PLM herself testified that, apparently soon after the sexual activity began, she had purposefully acted as if she were a willing participant because she was afraid, although she apparently did not display her fear to Powell. This evidence, that PLM pretended to be a willing sexual participant, entitled Powell to a "reasonable belief" instruction.

¶40 That other evidence may have established that PLM was highly incapacitated does not necessarily disprove that she reasonably appeared to Powell to be less incapacitated than she actually was. Instead, such evidence created weight and credibility issues for the jury to determine. Based on the record before us and the elements of the statutory defense, we conclude that the trial court would

have given an RCW 9A.44.030(1) "reasonable belief" instruction if defense counsel had so requested.

## 2. Lack of tactical reason for failure to request instruction

¶41 We must next decide whether defense counsel's failure to request the "reasonable belief" instruction was a legitimate tactical decision. We find instructive *Hubert*, 138 Wn. App. 924, a case Division One of our court decided.

¶42 Hubert's trial counsel similarly failed to request a "reasonable belief" instruction in defending Hubert against a second degree rape charge, even though, like here, the evidence supported Hubert's defense that he reasonably believed the victim was not physically helpless: Hubert testified that the sexual activity was consensual and that he believed the victim was awake during the entire incident. *Id.* at 926-27, 929. But Hubert's counsel neither argued the "reasonable belief" defense nor requested an instruction on that statutory defense (because counsel was unaware of this statutory defense). *Id.* at 929. The *Hubert* court held that counsel's failure to investigate the relevant law could not be characterized as a legitimate tactic and that this failure amounted to deficient performance. *Id.* at 929-30.

¶43 Based on his closing argument and the testimony he elicited from the witnesses, it appears that Powell's trial counsel was aware of the "reasonable belief" defense. But we are aware of no objectively reasonable tactical basis for failing to request a "reasonable belief" instruction when (1) the evidence supported such an instruction; (2) defense counsel, in effect, argued the statutory defense; and (3) the statutory defense was entirely consistent with the defendant's theory of the case. Thus, as in *Hubert*, we hold that failure to request such an instruction under these circumstances was deficient performance.

## D. Prejudice

¶44 *Hubert* is also instructive in determining whether Powell has met the prejudice prong of the ineffec-

tive assistance of counsel test. The *Hubert* court held that prejudice resulted from defense counsel's failure to request a "reasonable belief" instruction because, without such instruction, the jury had "no way to understand the legal significance of the evidence supporting the reasonableness of [the defendant's] belief that [the victim] was . . . capable of consenting to his [sexual] advances." *Id.* at 932. The court concluded, "Where defense counsel fails to identify and present the sole available defense to the charged crime and there is evidence to support that defense, the defendant has been denied a fair trial." *Id.*

¶45 Here, as in *Hubert* and as we set forth above, Powell presented evidence to support a "reasonable belief" instruction. And as Powell's defense counsel argued to the jury, Powell's perception that PLM had consented was his only viable defense in light of Powell's admission that he had had sexual contact with PLM. Powell had been adamant from the time of his initial contact with the police that she had consented or, at least, that it had appeared to him that she had consented, and that his belief was not out of line with the perceptions of others who had observed PLM around this time.[11]

¶46 Without the "reasonable belief" instruction, the jury had (1) no way to recognize and to weigh the legal significance of Powell's testimony and portions of defense counsel's closing argument that it appeared to Powell that PLM had consented; and (2) no way of acquitting Powell even if it believed he had reasonably believed PLM was not mentally incapacitated or physically helpless. Instead, it would have appeared to the jury that it had no option but to convict Powell if it found beyond a reasonable doubt that PLM had been mentally incapacitated or physically help-

---

[11] Furthermore, unlike many forcible rapes, there was no conclusive evidence of any physical violence because PLM's physical condition was also consistent with repeated aggressive consensual oral sex. Nor did the State charge that the rape had been committed with the use or threat of force. The pivotal issue was whether PLM was incapacitated and whether it had appeared to Powell that she had nevertheless been aware enough to have consented to the acknowledged sexual activity.

less, regardless of whether it also found that Powell reasonably believed PLM had consented. The absence of this instruction essentially nullified Powell's defense.

¶47 The resulting prejudice is all the more glaring here because even the alleged victim, PLM, testified that she had intentionally appeared to be consenting to Powell's sexual advances shortly after the sexual activity began. Thus, we cannot say that the trial's outcome would have necessarily been the same had the jury been provided with a "reasonable belief" instruction. *See Hubert*, 138 Wn. App. at 930 ("A reasonable probability 'is a probability sufficient to undermine confidence in the outcome.'" (quoting *Strickland*, 466 U.S. at 694)).

¶48 As in *Hubert*, we hold that defense counsel's failure to request a "reasonable belief" instruction could not have been a reasonable trial tactic and that such error deprived Powell of a fair trial.[12] Accordingly, Powell has demon-

---

[12] We find unpersuasive the State's argument that defense counsel's failure to request the "reasonable belief" instruction was a legitimate tactical decision because it was reasonable for defense counsel to require the State to prove every element of the offense rather than shift the burden of proof to the defendant by using an affirmative defense. Br. of Resp't at 13-14. The jury would have had to find that the State had met its burden and proved every element of the rape charge beyond a reasonable doubt even if the trial court had given the reasonable belief instruction. This affirmative defense was relevant only once the State proved the elements of the offense. Thus, a "reasonable belief" instruction would not have shifted the initial burden of proof to Powell.

As we noted above, the absence of a reasonable belief instruction meant that the jury had only one option *if the State met its burden of proof*: It had to convict Powell even if it also believed that Powell had established by a preponderance of the evidence that he reasonably believed that PLM was not mentally incapacitated and/or physically helpless. Limiting the jury's options in this way was not only not a reasonable tactical decision, it was prejudicial. Furthermore, to the extent defense counsel also argued that the evidence did not establish that PLM was intoxicated or incapacitated, that argument was not inconsistent with his additional argument that even if PLM had been intoxicated or incapacitated, Powell reasonably failed to recognize PLM's compromised condition.

Nor does the State's argument—that there was no prejudice because "the jury clearly did not accept his theory that [PLM] was not incapacitated"—demonstrate that there was no prejudice. Br. of Resp't at 15. All we can tell from the jury's verdict is that it believed that PLM was either too mentally incapacitated to understand the nature or consequences of the sexual acts or that she was unconscious or otherwise physically unable to communicate her unwillingness to participate in the sexual act. Because the trial court did not instruct the jury on the "reasonable belief" defense, the jury did not have the option of evaluating the

strated that he received ineffective assistance of counsel, and we reverse and remand for a new trial.

¶49 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

Van Deren, C.J., and Armstrong, J., concur.

_____

events of that night from Powell's subjective perspective. The jury's verdict simply does not reflect whether, given Powell's interactions with PLM, he reasonably believed that PLM was not impaired to the extent she was incapable of consent.