
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 67655-5-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| DUSTY RAY GRANDLUND, | ) | |
| | ) | |
| Appellant. | ) | FILED: March 4, 2013 |

SCHINDLER, J. — Dusty Ray Grandlund appeals his conviction of rape in the second degree for engaging in sexual intercourse with 15-year-old K.C. in violation of RCW 9A.44.050(1)(b). Grandlund contends insufficient evidence supports the conviction. In the alternative, he argues his attorney provided ineffective assistance of counsel. We affirm.

## FACTS

In 2011, 15-year-old K.C., born February 18, 1995, lived with her brother and sister-in-law in Arlington.[1] K.C.'s 17-year-old friend D.L. and D.L.'s sister, 14-year-old S.G., lived with their father Dusty Ray Grandlund on alternate weekends. Grandlund lived near K.C. and K.C. often stayed with D.L. and S.G. when they stayed with their father.

---

[1] K.C.'s brother and sister-in-law adopted K.C. after her mother died about four years before the incident in this case.

On January 8, 2011, K.C. went to Grandlund's house to spend the night with D.L. and S.G.

Grandlund's house has two bedrooms, a living room, a kitchen area, and a shared bathroom. The girls had three computers in their bedroom. K.C., D.L., and S.G. spent most of the evening in the bedroom talking and on Facebook. Grandlund spent most of the evening drinking mixed drinks of whiskey and Pepsi in the living room.

D.L. went to sleep between midnight and 1:00 a.m. S.G. and K.C. stayed up talking and playing on the computer. When S.G. fell asleep around 4:00 a.m., K.C. continued to use the computer.

After S.G. was asleep, Grandlund came into the bedroom and asked K.C. to help him transfer music files from the computer in his bedroom onto a thumb drive. K.C. went into Grandlund's bedroom to help him transfer the files. Grandlund was still drinking and wandered in and out of the bedroom as K.C. transferred the music files. After some time, Grandlund came into the room, put a big tumbler of whiskey and Pepsi on the computer desk, and told K.C. to drink it. K.C. said she didn't want to. But when Grandlund mocked her, K.C. drank the whiskey and Pepsi.

Over the next few hours, Grandlund gave K.C. about two more tumblers of mixed whiskey and Pepsi. When K.C. finished transferring the files, Grandlund took K.C. to the kitchen and gave her about three more mixed drinks of whiskey and Pepsi to drink from a shot glass.

K.C. testified that she felt drunk and her vision was blurry. K.C. said Grandlund then "asked me if I thought I could handle just alcohol and I said I don't know." Grandlund then gave K.C. two or three shots of straight whiskey.

2

K.C. said she was so intoxicated that she could not keep her balance, felt like the room was spinning, and had to lean on the kitchen counter for support. K.C. told Grandlund she couldn't drink anymore. Grandlund walked up to K.C., took her hand, and placed it on his penis. K.C. pulled her hand away and moved away from Grandlund, standing on the other side of the kitchen counter.

At about 6:00 a.m., D.L. woke up to walk her dog. D.L. came into the kitchen and saw her father and K.C. D.L. also saw K.C. drinking from a shot glass. D.L. testified that after she got angry with K.C. for leaning on her for support because "she was throwing all of her weight on me," she went back to bed.

Meanwhile, K.C. went to the living room and sat on the couch. Grandlund went and sat beside K.C. Grandlund took K.C.'s hand and placed it on his erect penis. Grandlund told K.C. he liked her and wished she were 18 instead of 15 years old. Grandlund then rubbed the inside of K.C.'s thigh, telling her not to say anything to anyone because he could get into trouble. K.C. said she "didn't really understand what [Grandlund] was saying though, because I -- like my reflexes were like slow and sluggish and it was hard to interpret stuff."

K.C. got off the couch and tried to walk to the girls' bedroom. K.C. said that her vision was blurred and she stumbled as she walked. K.C. felt very intoxicated and confused.

Grandlund stopped K.C. in the hallway, put his hand down her shorts, and penetrated her vagina with his fingers. Grandlund then pulled K.C. into his bedroom, pushed her down on the bed, and took off her shorts and underwear. Grandlund said, "[L]let me show you how it's done," began licking her neck and breasts, and performed

oral sex on K.C. K.C. tried to get Grandlund to stop but she was only able to mumble unintelligibly and could not move her arms and legs. Grandlund put on a condom and penetrated her vagina. K.C. said that before she lost consciousness, her last memory was of Grandlund's penis inside her vagina.

Sometime later that morning, D.L. and S.G. found K.C. passed out on the bathroom floor without her shirt on. D.L. and S.G. helped K.C. get to their bedroom, where she passed out again on the bed. D.L. found K.C.'s shirt on the floor in her father's bedroom. After K.C. woke up around 11:00 a.m., she found her glasses underneath a pillow on Grandlund's bed. When Grandlund woke up, K.C. and his daughters were sitting in the living room. Grandlund immediately went into the living room and asked K.C. and his daughters if they had seen his condom.

Around 1:00 p.m., D.L., S.G., and K.C. got in Grandlund's car. Rather than drop K.C. off first at her nearby house in Arlington, Grandlund drove to Lake Stevens to drop off his daughters at their mother's house. Grandlund then drove back to Arlington and stopped at a store to buy an energy drink and condoms. Grandlund told K.C. he wanted to take her back to his house so they could have sex again. K.C. insisted she had to go home because her brother was waiting for her.

Later that afternoon, K.C. told two friends what happened and her friends told K.C.'s sister-in-law. K.C.'s sister-in-law contacted the police.

At around 6:00 a.m. on January 10, police officers searched Grandlund's house. The police found a quarter-full bottle of whiskey and two bottles of Pepsi on the kitchen floor, a shot glass with some whiskey in it on the kitchen counter, glass tumblers matching K.C.'s description of the glass that held the mixed whiskey and Pepsi drinks,

4

three unopened condoms on a night stand in Grandlund's bedroom, and a condom wrapper in a garbage can in the kitchen. That same morning, a nurse at Cascade Valley Hospital conducted a sexual assault examination of K.C.

The State charged Grandlund with rape of a child in the third degree, Count I, and rape in the second degree, "when K.C. was incapable of consent by reason of being physically helpless," Count II. Grandlund waived his right to a jury trial.

The State called a number of witnesses to testify at the four-day trial, including K.C., D.L., S.G., and a forensic scientist from the Washington State Patrol Crime Laboratory. The forensic scientist testified that DNA[2] obtained from K.C. matched Grandlund's DNA.

Grandlund unequivocally denied having sexual intercourse with K.C. Grandlund said that he asked K.C. to transfer the computer files after his daughters went to sleep because he thought she was bored. Grandlund testified that after K.C. transferred the files on his computer, he asked her to perform the same task on S.G.'s computer, and he then went immediately to bed. Grandlund said he did not take K.C. directly home from his house because he forgot she was in the car.

The court found Grandlund guilty of rape of a child in the third degree and rape in the second degree as charged. The court entered written findings of fact and conclusions of law. The court found that Grandlund was guilty of rape in the second degree because K.C. was incapable of consent because she was physically helpless. The findings state, in pertinent part:

> 20. After penetrating K.C.'s vagina with his fingers for a little while, the defendant took K.C. by the hand and pulled her into his bedroom and pushed her down to sit on his bed. The defendant took off K.C.'s

---

[2] (Deoxyribonucleic acid.)

5

shorts and underwear. The defendant took off his jean pants and underwear.

21. K.C. fell on her back to keep from toppling over to the floor. The defendant began kissing K.C.'s neck and breasts. The defendant kissed down K.C.'s body and then began performing oral sex on K.C. The defendant penetrated K.C.'s vagina with his tongue.

22. K.C. tried to get the defendant to stop but she could not move her limbs. K.C. tried to tell the defendant to stop but she was only able to mumble unintelligibly and could not understand her words.

23. The defendant stopped performing oral sex on K.C., put on a condom, and penetrated her vagina with his penis.

24. K.C.'s last memory before she lost consciousness was of the defendant's penis inside her vagina.

. . . .

34. At the time the defendant engaged in sexual intercourse with K.C., she was incapable of consent by reason of being physically helpless.

At sentencing, the court vacated the conviction for rape of a child in the third degree to avoid double jeopardy. The court entered judgment on the conviction for rape in the second degree.

## ANALYSIS

Grandlund contends insufficient evidence supports the conviction of rape in the second degree.

A challenge to the sufficiency of the evidence admits the truth of the State's evidence. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). We view all evidence in the light most favorable to the State to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Joy, 121 Wn.2d 333, 338, 851 P.2d 654 (1993). "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." Salinas, 119 Wn.2d at 201. We defer to the trier of fact to resolve conflicting testimony, evaluate the credibility of witnesses, and generally weigh the persuasiveness of the evidence. State v. Walton, 64 Wn. App. 410, 415-16,

824 P.2d 533 (1992). Circumstantial and direct evidence are accorded equal weight. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

Where, as here, the trial court makes findings of fact and conclusions of law following a bench trial, we review whether substantial evidence supports the trial court's findings of fact and, in turn, whether the findings support the conclusions of law. State v. Stevenson, 128 Wn. App. 179, 193, 114 P. 3d 699 (2005). "Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the finding's truth." Stevenson, 128 Wn. App. at 193. Unchallenged findings of fact are verities on appeal. Stevenson, 128 Wn. App. at 193.

Under RCW 9A.44.050(1)(b), a person is guilty of rape in the second degree "when, under circumstances not constituting rape in the first degree, the person engages in sexual intercourse with another person [w]hen the victim is incapable of consent by reason of being physically helpless or mentally incapacitated." "Physically helpless" is defined as a person who "is unconscious or for any other reason is physically unable to communicate unwillingness to an act." RCW 9A.44.010(5). The State must prove each essential element of the crime beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); State v. Oster, 147 Wn.2d 141, 146, 52 P.3d 26 (2002).

Grandlund contends substantial evidence does not support the finding that K.C. "was incapable of consent by reason of being physically helpless."[3] Grandlund asserts K.C. was not "unable to communicate unwillingness"[4] because she initially "successfully rebuffed" him and was able to remember that while they were sitting on the couch,

---

[3] The State did not allege that K.C. was "mentally incapacitated."

[4] RCW 9A.44.010(5).

Grandlund said "he liked having me come over" and "he hasn't had sexual intercourse in about like six years." Grandlund also points to K.C.'s testimony that while she was drinking the first two or three drinks, she successfully copied the computer files.

Grandlund relies heavily on State v. Bucknell, 144 Wn. App. 524, 183 P.3d 1078 (2008). Bucknell is easily distinguished. In Bucknell, the victim had Lou Gehrig's disease and was unable to move from the chest down, but was "able to talk, answer questions, and understand and perceive information." Bucknell, 144 Wn. App. at 526, 529-30. The State charged the defendant with rape in the second degree, alleging that the victim "was physically helpless because she was suffering from Lou Gehrig's disease." Bucknell, 144 Wn. App. at 528. We reversed the jury conviction because the victim's "ability to communicate orally, despite her physical limitations, likely did not render her 'physically helpless' as contemplated by RCW 9A.44.050(1)(b)." Bucknell, 144 Wn. App. at 530-31.

Here, unlike in Bucknell, overwhelming evidence supports the finding that K.C. was not able to communicate. Grandlund does not challenge the finding that "K.C. tried to tell the defendant to stop but she was only able to mumble unintelligibly and could not understand her words." K.C. testified that after Grandlund pulled her into his bedroom and onto the bed, and he licked her neck and breasts, she felt numb and could not talk.

> A. My body felt really numb and it felt like my -- it felt like my heart was slowing down, and I didn't know what was going to happen. And then like I was just thinking, trying to think about what was going on and I couldn't move my arms real well. I couldn't talk, I couldn't see that well, everything looked like it was turning black.
>
> . . . .
>
> Q. When you say your -- your body was getting numb and it seemed like things [were] starting to become black, are you able to put in words exactly how your limbs were feeling, your arms and stuff?

8

A. It felt like I got hit by a car or something, and I couldn't move. It was like I was pinned to the bed or something.

Q. So you said at some point he was kissing you and kissing your breasts and your neck, and you said he began licking your vagina?

A. Yes.

Q. Could you feel him when he did that?

A. Not really.

Q. But you could tell that was in your vagina?

A. Yes.

Q. Did you do anything at this point when this was going on, that you recall?

A. Not that I can recall. All I remember is staring at the ceiling, and he was inside of me and then everything went black.

Q. Okay. Let's take that a step at a time. When you say he was inside you, was this when you said he was licking inside your vagina?

A. He was performing sexual intercourse when I was laying there and all I did was -- I was looking at the ceiling and then everything just -- it like -- it was like a door was shutting and I couldn't see anything else. Everything went black.

Q. You blacked out?

A. Yes.

. . . .

Q. [K.C.], you said you blacked out, what is the last memory you have before you blacked out?

A. He had his penis inside of me.

Viewing the evidence and the inferences in the light most favorable to the State, sufficient evidence supports the conviction of rape in the second degree.

In the alternative, Grandlund contends his attorney provided ineffective assistance of counsel by failing to argue that Grandlund had a "reasonable belief" that K.C. was not physically helpless. Under RCW 9A.44.030(1), it is a defense to a charge of rape in the second degree that the defendant reasonably believed the person was not physically helpless. The defendant bears the burden of proof by a preponderance of the evidence. RCW 9A.44.030(1).

In order to prevail on a claim of ineffective assistance of counsel, Grandlund must demonstrate (1) deficient performance, that his attorney's representation fell below

the standard of reasonableness; and (2) resulting prejudice, that but for the deficient performance, the result would have been different. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Bowerman, 115 Wn.2d 794, 808, 802 P.2d 116 (1990) (adopting the standards in Strickland). If a defendant fails to establish either prong, we need not inquire further. State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

To establish deficient performance, Grandlund has the heavy burden of showing that his attorney "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. There is a strong presumption of effective representation of counsel, and the defendant has the burden to show that based on the record, there are no legitimate strategic or tactical reasons for the challenged conduct. State v. McFarland, 127 Wn.2d 322, 335-36, 899 P.2d 1251 (1995).

Grandlund did not testify that he had a reasonable belief that K.C. was not physically helpless. Grandlund testified that he did not have sexual intercourse with K.C. However, for the first time on appeal, Grandlund relies on D.L.'s testimony that K.C. appeared only "[a] little" drunk beforehand and "a little out of it" afterwards to contend there was evidence to argue Grandlund reasonably believed K.C. was not physically unable to communicate unwillingness. Grandlund takes D.L.'s testimony out of context. D.L. testified, in pertinent part:

Q. Did you make any statements to [K.C.]?
A. Yeah. I told her not to touch me.
Q. Why did you -- were you angry with her?
A. Yeah, because she was throwing all of her weight on me.
Q. She was throwing all of her weight on you?
A. Yeah, like she put her arm around me and it just was not comfortable.

Q. Has she put her arm around you before in the past?
A. Nope.
Q. Never put her hands on your shoulder to hold you as a friend?
A. No.
Q. So when you say she was throwing all her weight on you, was she leaning on you?
A. Yep.
Q. Did it seem like she was off balance?
A. Kind of.

. . . .

Q. Okay. Did she appear to you like she had been drinking?
A. A little bit, yeah.

State v. Powell, 150 Wn. App. 139, 206 P.3d 703 (2009); and In re Personal Restraint of Hubert, 138 Wn. App. 924, 158 P.3d 1282 (2007), are distinguishable. In Powell and Hubert, the defendants testified they believed the victims had agreed to have sex. Powell, 150 Wn. App. at 148-49, 156; Hubert, 138 Wn. App. at 926-27, 929.

We affirm.

WE CONCUR: