# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 49687-9-II |
| Respondent, | |
| v. | |
| JASON DAVID WHITTAKER, | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, J. — Jason David Whittaker appeals his convictions for two counts of second degree rape. Regarding count 1, Whittaker argues that his defense counsel was ineffective when he failed to propose a statutory affirmative defense jury instruction that Whittaker reasonably believed that the victim was not mentally incapacitated or physically helpless. For count 2, he argues that sufficient evidence fails to support his conviction. We affirm.

## FACTS

The State charged Whittaker with two counts of second degree rape.[1] Count 1 occurred when the victim was incapacitated or physically helpless in the back seat of a car. Count 2 occurred while she was unconscious on a bed in Whittaker's home.

## I. STATE'S TESTIMONY

The victim, DT; DT's friend, Natasha Herd; Herd's significant other, Tony Strobel; DT's mother; law enforcement; and a deoxyribonucleic acid (DNA) expert testified at trial.

---

[1] "A person is guilty of rape in the second degree when . . . the person engages in sexual intercourse with another person . . . [w]hen the victim is incapable of consent by reason of being physically helpless or mentally incapacitated." RCW 9A.44.050(1)(b)

## A. DT's Testimony

DT was best friends with Herd. Herd was dating Strobel, and Strobel's roommate was Whittaker. DT met to socialize with Herd, Strobel, and Whittaker, and the group went to a strip club together. DT consumed two alcoholic beverages in her first 30 minutes at the club and blacked out, so she does not remember very much. She remembers that Whittaker touched her thigh, and she told him to stop. And she remembers going outside to smoke with Strobel and Herd.

When leaving the strip club, someone put DT into the back seat of the car with Whittaker and because of her blackout, she did not remember much. She was awake for three or four minutes during the drive back to Whittaker's home. DT was laying on her side in the back seat and Whittaker put her head into his lap. DT tried to sit up, but Whittaker held her shoulder and pushed her head back onto his lap. When she woke up in the back seat of the car, DT felt "extremely drunk" and "dizzy and like I was going to puke." 2 Verbatim Report of Proceedings (VRP) at 194. She "couldn't really speak." 2 VRP at 226. Strobel and Herd were in the driver's and front passenger's seats.

The next thing DT remembers is that Herd and Strobel bathed her at Whittaker's house, changed her into clean clothes, and helped her to the bed in Whittaker's daughter's room. Herd and Strobel left to smoke. DT blacked out again. She woke up "with [Whittaker] on top of me." 2 VRP at 200. She experienced "pain between [her] legs . . . [b]ecause he was . . . putting his . . . d*** inside [her]." 2 VRP at 201. She told him to stop and said, "[N]o." 2 VRP at 201. DT heard Strobel scream, and then she blacked out again.

Strobel and Herd drove DT home while she cried in the back seat. DT's mother put DT in the shower, where she cried from the pain between her legs. DT's mother took her to the hospital, where medical personnel examined DT and she spoke with a nurse and advocate.

On cross-examination, DT said she could not remember a previous conversation with a detective in which DT told the detective that she had consumed six drinks at the club.

## B. TONY STROBEL'S TESTIMONY

At the strip club, DT went outside to smoke with Strobel and Herd and also smoked outside alone with Whittaker one time. Strobel testified that when he, DT, Whittaker, and Herd left the strip club, DT seemed drunk. She had problems standing and walking. DT said a friend was going to pick her up and she did not want to go with Strobel. Because DT was drunk, Strobel checked the text message from DT's friend, and it did not indicate that the friend was going to give DT a ride. Strobel was concerned for DT's safety and refused to leave her at the club by herself. Strobel had to lead her to the car because she was not walking properly.

Strobel drove them all back to Whittaker's house. The drive took about 20 minutes. Whittaker and DT were in the back seat. At one point, Strobel saw in his rearview mirror that DT was lying down with her head on Whittaker's lap. Once they arrived at Whittaker's house, DT got out of the car, had trouble walking, and threw up on herself. Strobel could not remember if DT was able to have a conversation. Strobel and Herd gave her a cold bath and put her in a bedroom. Strobel and Herd went outside to smoke but left the door open to listen in case DT vomited again.

After several minutes, Strobel went inside the house to check on DT. Strobel went to the bedroom where DT was located and noticed the door was shut. Strobel opened the door, and Whittaker immediately shut the door. Strobel opened the door again and asked Whittaker what

was going on and said Whittaker needed to get out of the room. Strobel saw that DT's pants were down and her legs were off the bed. Strobel told Herd that she needed to deal with DT, and then Strobel called Whittaker's wife to "let her know what was going on." 2 VRP at 320. Whittaker yelled that he wanted the others to leave his house. Strobel returned to the room where DT was located and noticed that she was crying and saying "her crotch hurt." 2 VRP at 324. Strobel and Herd took DT home to be with her mother.

## C. STACY SMITH'S TESTIMONY

DT's mother, Stacy Smith, testified that when DT arrived home from Whittaker's house, she stumbled and had trouble walking. Smith helped DT go inside their apartment and during the walk, DT said, "'[O]w, ow, ow." 2 VRP at 256. Smith took DT to the bathroom and put her in the shower. DT sat on a stool in the shower, said she was in pain, started crying, and stated that "he raped me." 2 VRP at 267. DT complained of pain in her vaginal area, and Smith observed that it was bright red. Smith took DT to the hospital.

On cross-examination, Smith stated that DT texted her several times throughout the night and said she was having "lots of fun" at the club. 2 VRP 274.

## D. LAURA KELLY'S TESTIMONY

Forensic scientist Laura Kelly received and tested a bag of clothing, bedding, Whittaker's DNA sample, and a sexual assault evidence kit. None of the DNA-tested evidence contained Whittaker's semen. A stain on a blanket that was on the bed at the time of the incident contained the combined DNA of DT and Whittaker. The DNA in the blanket stain sample was from human amylase, which is found in human saliva, vomit, and feces. The space between DT's vagina and anus contained a Y chromosome short tandem repeats DNA profile consistent with Whittaker's

that "is not expected to occur more frequently than one in eight thousand six hundred male individuals in the U.S. population." 3 VRP at 449.

On cross-examination, Kelly stated that there was no male DNA profile detected on the samples taken from inside DT's vagina or sweatpants. The comforter stain containing a mixture of Whittaker's and DT's DNA could have resulted from indirect contact through a process called "secondary transfer" by which DNA goes from an individual onto an item and then from that item onto a second item. 3 VRP at 457. But based on the quantity of DNA contained in the stain from Whittaker and DT, secondary transfer was unlikely.

## II. WHITTAKER'S TESTIMONY

Whittaker testified that he "hit[] on" DT at the strip club and put his hands on her legs. 4 VRP at 634. He did not notice that DT was intoxicated when they were at the strip club or as they left. Whittaker talked with DT throughout the night, and the two smoked outside together. She did not appear to struggle standing or walking to the car, and Whittaker did not help her walk or see anyone else helping her. When asked about his "appreciation of [DT's] intoxication level," Whittaker answered, "[I]t just seemed like she was having fun." 4 VRP at 645. There were no external indications to Whittaker that DT was extremely intoxicated at the time they left the club and returned to Whittaker's house.

When they were first in the car, DT and Whittaker were sitting apart, but then DT laid her head on his lap, said she wanted him, and rubbed his thigh and penis. Whittaker got his fingers wet, put his hands down DT's pants, and digitally penetrated her. DT was awake the entire time. Whittaker stopped touching DT when Strobel looked in the rearview mirror approximately two to three minutes after the car left the club.

After arriving at Whittaker's house, DT vomited and Whittaker realized for the first time how intoxicated she was. Strobel and Herd bathed and changed DT into clean clothes and put her in Whittaker's daughter's room. Whittaker stayed with DT while Strobel and Herd left to smoke. He was scrolling through social media on his phone when DT stood, pulled down her pants, and laid back down.

Strobel and Herd came down the hallway and Strobel yelled. Whittaker told Strobel that there was "nothing going on." 4 VRP at 647. Whittaker felt that Strobel was "accusing" him of something, and Whittaker tried to close the door because he "knew what they were thinking and . . . knew it didn't happen!" 4 VRP at 648-49. Whittaker was not bent over DT in any way when Strobel opened the door. Whittaker did not indicate why Strobel and Herd would think he was having sexual contact with DT.

Strobel and Herd opened the door again and came inside the bedroom. Whittaker left the room and told Strobel and Herd to leave his house. He denied any sexual touching when DT was passed out on the bed in the bedroom.

### III. CLOSING ARGUMENTS

The State argued that Whittaker took advantage of DT in the car and bedroom when she was incapable of consenting. Regarding count 1, the State focused on Whittaker's admission that he penetrated DT in the car and Strobel's testimony that DT was extremely intoxicated at the club and at Whittaker's house after arriving back from the club. Regarding count 2, the State discussed Strobel's and DT's testimony and also emphasized the stain on the comforter containing a mixture of DT's and Whittaker's DNA, indicating that Whittaker was on the bed engaged in sexual contact when DT was incapacitated.

Defense counsel's primary theory of defense was that there was insufficient evidence of penetration for both counts of rape. Counsel argued that based on the lack of Whittaker's DNA from the tested evidence or any male amylase in DT's vagina, Whittaker never penetrated her, either in the back seat of the car or in the bedroom. Based on the lack of amylase in DT's vagina, counsel argued that Whittaker licked his finger before attempting and failing to digitally penetrate her. Counsel argued that Whittaker was drunk and contrary to Whittaker's trial testimony, he only *thought* he was penetrating DT in the car.

Defense counsel also argued a second theory that DT appeared to consent to the first sexual encounter. The testimony established that DT was acting and interacting normally and did not appear "so inebriated she didn't know what she was doing." 4 VRP at 734. Defense counsel noted that DT texted her mother from the club saying that DT was having a good time. In addition, "[s]he wasn't falling down drunk. She wasn't drooling. Her head wasn't laying on her side. That's the testimony." 4 VRP at 734. Defense counsel also argued that DT initiated and consented to sexual contact in the car when she touched Whittaker's leg and other body parts and said she wanted him. According to defense counsel, "it would be reasonable for [Whittaker] to suspect and believe that they did want to have a relationship at least in the back of the car." 4 VRP at 739.

Defense counsel also asserted that testimony suggesting that Whittaker penetrated DT in the bedroom was unreliable and inconclusive, and no sexual encounter occurred in the bedroom.

IV. Jury Instructions and Verdict

The trial court instructed the jury that "[a] person commits the crime of rape in the second degree when he or she engages in sexual intercourse with another person when the other person is incapable of consent by reason of being physically helpless or mentally incapacitated." Clerk's

Papers (CP) at 160. "Consent means that at the time of the act of sexual intercourse and/or contact there are actual words or conduct indicating freely given agreement to have sexual intercourse and/or contact." CP at 162.

The "to-convict instructions" required the jury to find that DT was "incapable of consent by reason of being physically helpless or mentally incapacitated." CP at 164-65. The trial court also defined "mental incapacity" and "physically helpless" as follows:

> Mental incapacity is a condition existing at the time of the offense that prevents a person from understanding the nature or consequences of the act of sexual intercourse . . . whether that condition is produced by illness, defect, the influence of a substance, or by some other cause.
> A person is physically helpless when the person is unconscious or for any other reason is physically unable to communicate unwillingness to an act.

CP at 163.

The jury was not given and defense counsel did not propose a jury instruction on the statutory "reasonable belief" defense.

The jury convicted Whittaker on both counts of second degree rape. The trial court ordered a standard range sentence. Whittaker appeals.

## ANALYSIS

### I. INEFFECTIVE ASSISTANCE OF COUNSEL – COUNT 1

For count 1, Whittaker argues that he received ineffective assistance of counsel when defense counsel failed to propose a jury instruction on the affirmative defense that at the time of Whittaker's conduct in the car, he reasonably believed DT was not mentally incapacitated or physically helpless. We disagree.

## A.  PRINCIPLES OF LAW

Ineffective assistance of counsel is a mixed question of law and fact that we review de novo.  *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).  To establish a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's performance was deficient and (2) the deficient performance prejudiced the defense.  *State v. Grier*, 171 Wn.2d 17, 33-34, 246 P.3d 1260 (2011).  A failure to satisfy either prong is fatal to a claim of ineffective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

A person is guilty of second degree rape when the person engages in sexual intercourse with another person when the victim is incapable of consent by reason of being physically helpless or mentally incapacitated.  RCW 9A.44.050(1)(b).

RCW 9A.44.030(1) provides a statutory "reasonable belief" defense to a charge of second degree rape under RCW 9A.44.050(1)(b):

> In any prosecution under this chapter in which lack of consent is based solely upon the victim's mental incapacity or upon the victim's being physically helpless, it is a defense which the defendant must prove by a preponderance of the evidence that *at the time of the offense the defendant reasonably believed that the victim was not mentally incapacitated and/or physically helpless.*

RCW 9A.44.030(1) (emphasis added).

There is a corresponding pattern jury instruction for this defense.  11 WASHINGTON PRACTICE:  WASHINGTON PATTERN JURY INSTRUCTIONS:  CRIMINAL 19.03, at 313 (4th ed. 2016).  The defendant has the burden of proof regarding this defense.  *State v. Coristine*, 177 Wn.2d 370, 378, 300 P.3d 400 (2013); RCW 9A.44.030(1).

B. DEFICIENT PERFORMANCE

Whittaker argues that under *State v. Powell*, 150 Wn. App. 139, 206 P.3d 703 (2009), counsel was deficient for failing to request a "reasonable belief" instruction. This argument fails.

1. PRINCIPLES OF LAW

The defendant bears the burden of establishing deficient performance, and we presume that counsel's performance was reasonable. *Grier*, 171 Wn.2d at 33. Performance is deficient if it falls below an objective standard of reasonableness. *Grier*, 171 Wn.2d at 33. Counsel's conduct is not deficient when it can be characterized as legitimate trial strategy or tactics. *Grier*, 171 Wn.2d at 33.

"An affirmative defense places a burden of proof on the defendant, thus shaping the defense by introducing elements it must prove." *Coristine*, 177 Wn.2d at 378. "This process may influence a wide range of strategic trial decisions, such as who is called to testify, the questions asked on direct and cross-examination, and what arguments are made in summation." *Coristine*, 177 Wn.2d at 378.

2. *POWELL* IS DISTINGUISHABLE

Whittaker argues that *Powell* supports that Whittaker's counsel was deficient for failing to request a "reasonable belief" instruction. We conclude that *Powell* is distinguishable.

In *Powell*, the defendant had sexual intercourse with an intoxicated woman. 150 Wn. App. at 142-43. Numerous witnesses testified that the victim did not seem intoxicated, and the defendant asserted that the victim seemed to consent to the sexual activity and did not appear too intoxicated to consent. *Powell*, 150 Wn. App. at 142-45, 148-49. The victim testified that she was drunk and blacked out at the start of the sexual encounter, and once she regained consciousness

10

during the sexual encounter, she pretended to enjoy it because she was afraid that the defendant, who was a total stranger to her, would harm her. *Powell*, 150 Wn. App. at 143.

Powell's defense counsel did not request a "reasonable belief" instruction, but counsel did argue in closing argument that the victim was not physically helpless and appeared to consent and be "*able to consent*" to the sexual activity. *Powell*, 150 Wn. App. at 151 (emphasis added). The court held that under these facts, failure to request a "reasonable belief" instruction was deficient performance because "(1) the evidence supported such an instruction; (2) defense counsel, in effect, argued the statutory defense; and (3) the statutory defense was entirely consistent with the defendant's theory of the case." *Powell*, 150 Wn. App. at 155.

Here, Whittaker's counsel did not argue the statutory defense that Whittaker reasonably believed that DT had capacity to consent. Unlike Powell's counsel, who argued that the victim appeared "able to consent," Whittaker's counsel merely argued, based on testimony regarding DT's conduct at the club and in the car that DT *consented* to the contact in the car. This record does not support a conclusion that Whittaker's counsel in effect argued that Whittaker had a reasonable belief that the victim had *capacity* to consent. In asserting that DT consented, Whittaker's counsel attempted to undermine the State's evidence that the car encounter was nonconsensual rather than to raise the "reasonable belief" affirmative defense regarding DT's apparent capacity. *See Coristine*, 177 Wn.2d at 378.

*Coristine* recognized that it is a reasonable trial strategy for a defendant not to assume the burden of proof for this affirmative defense and instead argue that the State failed to carry its burden of proof. 177 Wn.2d at 379. Here, defense counsel may have adopted that strategy.

11

Moreover, defense counsel's conduct was not deficient because his primary argument was that there was insufficient evidence of penetration for both counts of rape. Counsel acted strategically and thus was not deficient when he focused on the lack of forensic evidence and attempted to cast doubt on the State's case in chief. *See Grier*, 171 Wn.2d at 33; *Coristine*, 177 Wn.2d at 378.

3.    CONCLUSION

Whittaker's counsel was not deficient because counsel strategically argued that the State failed to carry its burden of proof, and under *Coristine*, it is a reasonable trial tactic not to assume the burden of proof of an affirmative defense. Thus, Whittaker's ineffective assistance of counsel claim fails.[2]

## II. SUFFICIENCY OF THE EVIDENCE

The parties dispute whether Whittaker's conviction for count 2 is supported by sufficient evidence. We hold that sufficient evidence supports Whittaker's second degree rape conviction on count 2.

The test for determining sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Homan*, 181 Wn.2d 102, 105, 330 P.3d 182 (2014). In a sufficiency of

---

[2] Whittaker also relies on *In Re Personal Restraint of Hubert*, 138 Wn. App. 924, 158 P.3d 1282 (2007). In *Hubert*, the defendant's trial counsel submitted a declaration for the appeal stating that he failed to argue the "reasonable belief" defense because he failed to investigate properly and did not know the defense existed until Hubert's appellate counsel brought it to his attention. 138 Wn. App. at 929-30. Division One of this court held that "[c]ounsel's failure to discover and advance the defense was plainly deficient performance." *Hubert*, 138 Wn. App. at 930. Whittaker does not allege a similar failure to investigate in this case or point to any facts suggesting that counsel was unaware of the "reasonable belief" defense. Thus, *Hubert* is distinguishable.

the evidence claim, the defendant admits the truth of the State's evidence and all reasonable inferences drawn from that evidence. *Homan*, 181 Wn.2d at 106. We defer to the fact finder on issues of conflicting testimony, witness credibility, and persuasiveness of the evidence. *State v. Emery*, 161 Wn. App. 172, 199, 253 P.3d 413 (2011), *aff'd*, 174 Wn.2d 741, 278 P.3d 653 (2012). Circumstantial and direct evidence are equally reliable. *State v. Miller*, 179 Wn. App. 91, 105, 316 P.3d 1143 (2014).

A person is guilty of second degree rape when the person engages in sexual intercourse with another person when the victim is incapable of consent by reason of being physically helpless or mentally incapacitated. RCW 9A.44.050(1)(b).

Here, DT testified that she blacked out in the bedroom and woke up with Whittaker on top of her, penetrating her. In addition, when Strobel left DT in the bedroom, she had her pants on, and when he returned minutes later, DT's pants were down, and Whittaker tried to shut the door to prevent Strobel from coming into the room. This evidence gives rise to a reasonable inference that Whittaker raped DT.

Forensic evidence also supports a reasonable inference that Whittaker raped DT. Further, during and immediately after the incident, DT was in pain. Later that evening, DT told her mother that she was in pain and that "he raped me," and DT's mother observed that DT's vaginal area was bright red. 2 VRP at 267.

Whittaker acknowledges that "[t]he witnesses presented conflicting testimony." Br. of Appellant at 24. But he asserts that because there was conflicting testimony and because no male DNA was found in DT's vagina, "no rational juror could have found beyond a reasonable doubt that Whittaker had sexual intercourse with [DT] in the bedroom." Br. of Appellant at 28.

No. 49687-9-II

Whittaker's argument fails because conflicting evidence is evaluated by the fact finder and does not establish that there is insufficient evidence to support the jury's verdict. *See Emery*, 161 Wn. App. at 199.

In a sufficiency of the evidence challenge, Whittaker must admit the truth of the State's evidence, which includes DT's account of the rape in the bedroom. *See Homan*, 181 Wn.2d at 106. DT's testimony regarding Whittaker's penetration when DT was passed out in the bedroom, alone, provides sufficient evidence to support the conviction. *See Homan*, 181 Wn.2d at 106. And DT's testimony is further corroborated by additional witness testimony and forensic evidence.

A rational juror could have found beyond a reasonable doubt that Whittaker raped DT. *Homan*, 181 Wn.2d at 106. As such, Whittaker's sufficiency of the evidence challenge fails.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, J.

We concur:

MAXA, C.J.

MELNICK, J.

14