IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON | ) | No. 77445-0-I |
| Respondent, | ) ) | |
| | ) | DIVISION ONE |
| v. | ) ) | |
| DEREJE ASRAT DEGFU, AKA DEREJE YAKAYO KEBEDE, | ) ) ) | UNPUBLISHED OPINION |
| Appellant. | ) ) ) | FILED: September 23, 2019 |

SMITH, J. — Dereje Kebede,[1] an off-the-clock Uber driver, picked up 22-year-old J.A. from a taco stand at a known party spot on Capitol Hill at 1:55 a.m., drove her to a motel in Tukwila, and tried to have sex with her while she was incapacitated. Kebede testified J.A. was not drunk and she initiated and consented to sexual intercourse. A jury did not accept Kebede's testimony and convicted him of attempted second degree rape.

On appeal, Kebede argues that the State failed to prove he believed J.A. was incapacitated. But given the overwhelming evidence of J.A.'s obvious intoxication, sufficient evidence supports his conviction. The same overwhelming evidence supports a conclusion that any ambiguity within the jury instructions was harmless beyond a reasonable doubt. We also reject Kebede's claims of

---

[1] Although the State charged the defendant as "Dereje Asrat Degfu," counsel for appellant and counsel for respondent refer to appellant's last name as "Kebede." We therefore refer to appellant as "Kebede" throughout the opinion.

prosecutorial misconduct, ineffective assistance of counsel, and improper exclusion of evidence. Finally, none of the issues in Kebede's statement of additional grounds for review (SAG) warrant reversal. We affirm Kebede's conviction but remand to the trial court to strike Kebede's court costs from his judgment and sentence due to his indigency at the time of sentencing.

FACTS

On March 28, 2015, J.A. worked a double shift until around 10:00 p.m. and then met her friends at a nightclub on Capitol Hill to celebrate her 22nd birthday. J.A., who weighed about 120 pounds, did not have time to eat that night, and after consuming Red Bull and vodka, shots, and beer, she blacked out. While in the nightclub, J.A. lost her cell phone. She was later kicked out of the club and a black "X" was drawn on her hand, signifying that she was too intoxicated to reenter the club.

Kebede, an Uber driver, dropped off his last passenger at 1:46 a.m. and signed off of the Uber application. He picked up J.A. at 1:55 a.m. while she was eating a taco in front of a taco truck. J.A. was trying to flag down a taxi in front of Kebede, but he honked so that the taxi would drive off and J.A. would get in his car. Kebede believed J.A. wanted to go to Des Moines, south of Seattle, but he drove her northeast to the Washington Park Arboretum (Arboretum Park). At the park, she looked for her lost cell phone in his car and urinated in some nearby bushes. Kebede then drove J.A. down Martin Luther King Jr. Way from Seattle to a motel in Tukwila, where he attempted to have sex with her but could not maintain an erection.

The next morning, J.A. awoke in the motel, still intoxicated, and did not know where she was or who Kebede was. Kebede told her that they had sex. J.A. used Kebede's phone to call a friend and Kebede dropped off J.A. at that friend's house. After processing that she had been raped, J.A. ran out of the house into the front yard and was kneeling and lying on the ground, screaming and hysterical. A police officer saw J.A. and offered assistance. After speaking with the officer, J.A. decided to go to the hospital for a sexual assault evaluation. The exam revealed Kebede's saliva DNA (deoxyribonucleic acid) on J.A.'s vaginal area as well as several vaginal injuries.

The State charged Kebede with attempted second degree rape. Kebede gave a statement to police that was videotaped and later admitted at trial. At trial, Kebede testified that J.A. was not drunk and that she initiated their sexual encounter. A jury convicted him as charged. Kebede appeals.

ANALYSIS

Sufficiency of the Evidence

Kebede argues that the State presented insufficient evidence that he intended to have intercourse with a mentally incapacitated person and, therefore, his conviction should be reversed. We disagree.

In determining the sufficiency of the evidence, we view the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Townsend, 147 Wn.2d 666, 679, 57 P.3d 255 (2002). A challenge to the sufficiency of the evidence admits the truth of the evidence.

3

State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Further, "all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." Salinas, 119 Wn.2d at 201. "In determining the sufficiency of the evidence, circumstantial evidence is not to be considered any less reliable than direct evidence." State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

"A person is guilty of an attempt to commit a crime if, with intent to commit a specific crime, he or she does any act which is a substantial step toward the commission of that crime." RCW 9A.28.020(1). "A person is guilty of rape in the second degree when . . . the person engages in sexual intercourse with another person . . . [w]hen the victim is incapable of consent by reason of being . . . mentally incapacitated." RCW 9A.44.050(1)(b). "'Mental incapacity' is that condition existing at the time of the offense which prevents a person from understanding the nature or consequences of the act of sexual intercourse whether that condition is produced by illness, defect, the influence of a substance or from some other cause." RCW 9A.44.010(4). Therefore, to commit the crime of attempted rape in the second degree, "the defendant must intend to have intercourse with a victim incapable of consent." State v. Weaville, 162 Wn. App. 801, 816, 256 P.3d 426 (2011).

Second degree rape is a strict liability crime because it has no mens rea. Cf. State v. Deer, 175 Wn.2d 725, 731, 287 P.3d 539 (2012) ("As a strict liability crime, child rape in the third degree requires no proof of mens rea."). In other words, the defendant's "knowledge" of the victim's incapacity is not a statutory

4

element of second degree rape. State v. Lough, 70 Wn. App. 302, 328 n.20, 853 P.2d 920 (1993), aff'd, 125 Wn.2d 847, 889 P.2d 487 (1995). Therefore, a defendant may assert an affirmative defense and "prove by a preponderance of the evidence that at the time of the offense the defendant reasonably believed that the victim was not mentally incapacitated." RCW 9A.44.030(1).

But when the crime is not completed and is charged as *attempted* second degree rape, there is a mens rea requirement because the State must prove that the defendant *intended* to have intercourse with a victim *who is incapable of consent.* Weaville, 162 Wn. App. at 816. Washington "require[s] the highest possible mental state for criminal attempt because criminal attempt focuses on the dangerousness of the actor, not the act." State v. Johnson, 173 Wn.2d 895, 905, 270 P.3d 591 (2012). Therefore, it is not sufficient for the State to prove only that the defendant intended to have sexual intercourse. The State must prove that the defendant intended to have sexual intercourse with an incapacitated victim. Cf. Johnson, 173 Wn.2d at 907 (disapproving of the statement in State v. Chhom, 128 Wn.2d 739, 743, 911 P.2d 1014 (1996), that defined the criminal result of rape of a child as sexual intercourse alone). That said, intent "may be inferred from all the facts and circumstances surrounding the commission of an act or acts." State v. Bergeron, 105 Wn.2d 1, 19, 711 P.2d 1000 (1985); State v. Abuan, 161 Wn. App. 135, 155, 257 P.3d 1 (2011) (Criminal intent may be inferred "from conduct that plainly indicates such intent as a matter of logical probability.").

In <u>Johnson</u>, the State charged the defendant with attempted promotion of commercial sexual abuse of a minor. <u>Johnson</u>, 173 Wn.2d at 909. There, the minor victims were fictitious and the actual communications for which the defendant was prosecuted occurred with adult women posing as minors. <u>Johnson</u>, 173 Wn.2d at 897. The Supreme Court held that its statement in <u>State v. Patel</u>, 170 Wn.2d 476, 485, 242 P.3d 856 (2010), that "a defendant who attempts to have sex with a person he believes is underage but is actually an adult may not be convicted" of attempted child rape, was dicta. <u>Johnson</u>, 173 Wn.2d at 904. It clarified that "[t]he State must prove the age of the intended victim to prove that the defendant intended to have sexual intercourse with a child." <u>Johnson</u>, 173 Wn.2d at 908. Similarly, to obtain a conviction for attempted second degree rape, the State must prove that the defendant intended to have intercourse with an incapacitated person.

Here, taking the evidence in the light most favorable to the State, there was sufficient evidence that Kebede intended to have intercourse with a person who was incapable of consent. J.A. testified that she blacked out at the nightclub, was kicked out, and had a black "X" on her wrist. One of J.A.'s friends testified that J.A. seemed very drunk and was hanging onto a friend for support outside of the nightclub after she was kicked out. Kebede testified that he turned off his Uber application just before he picked up J.A. in front of a taco stand on Capitol Hill. Instead of driving south and taking J.A. to Des Moines, where he believed she lived, he drove her northeast to Arboretum Park, where J.A. urinated in the bushes and looked for her lost phone in his car. Kebede admitted

6

that he told a detective that when he picked up J.A., she was "tipsy," would have been over the legal limit to drive, and was acting unlike "99 percent" of his other passengers. From this evidence, a rational juror could reasonably have inferred from the surrounding facts and circumstances that Kebede intended to have intercourse with J.A. while she was incapacitated. Although Kebede testified that J.A. was not drunk, the jury, who was in the best position to weigh the credibility and persuasiveness of Kebede's perceptions, clearly did not believe him.

Kebede argues that the evidence was insufficient because there was contradicting testimony regarding the level of J.A.'s intoxication. But on a sufficiency challenge, all evidence must be taken in the light most favorable to the State. The evidence outlined above, when taken in the light most favorable to the State, was sufficient to prove that Kebede believed J.A. was intoxicated and incapable of consent.

### Jury Instructions

Kebede argues that his right to due process was violated because the jury instructions failed to clarify that the jury needed to find that he intended to have sex with an incapacitated person. Because any error was harmless, we disagree.

"'We review alleged errors of law in jury instructions de novo.'" State v. Nelson, 191 Wn.2d 61, 69, 419 P.3d 410 (2018) (quoting State v. Boss, 167 Wn.2d 710, 716, 223 P.3d 506 (2009)). "'An omission or misstatement of the law in a jury instruction that relieves the State of its burden to prove every element of the crime charged is erroneous.'" Nelson, 191 Wn.2d at 69 (quoting State v.

Thomas, 150 Wn.2d 821, 844, 83 P.3d 970 (2004)). "The standard for clarity in a jury instruction is higher than for a statute" because "a jury lacks . . . interpretive tools and thus requires a manifestly clear instruction." State v. LeFaber, 128 Wn.2d 896, 902, 913 P.2d 369 (1996), abrogated on other grounds by State v. O'Hara, 167 Wn.2d 91, 217 P.3d 756 (2009). "[A]n omission or misstatement may nevertheless be subject to harmless error analysis." Nelson, 191 Wn.2d at 69. An omission or misstatement is harmless if it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. Nelson, 191 Wn.2d at 69.

LeFaber is instructive here. In that case, the trial court gave the jury the pattern instruction on self-defense, which separated the terms "reasonably believed" and "imminent danger" in separate subsections. LeFaber, 128 Wn.2d at 901. The Supreme Court held that the grammatical structure of the instruction created an ambiguity that "permit[ed] an erroneous interpretation of the law." LeFaber, 128 Wn.2d at 902. The court reasoned that "[a]lthough a juror could read instruction 20 to arrive at the proper law, the offending sentence lacks any grammatical signal compelling that interpretation over the alternative, conflicting, and erroneous reading." LeFaber, 128 Wn.2d at 902-03.

The same is true here, where the trial court gave this to-convict instruction, which is based on the pattern instruction:

> To convict the defendant of the crime of Attempted Rape in the Second Degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That between the dates of March 28, 2015 and March 29, 2015, the defendant did an act that was a substantial step toward the commission of rape in the second degree;

8

(2) That the act was done with the intent to commit rape in the second degree; and

(3) That the act occurred in the State of Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

A previous instruction stated that "[a] person commits the crime of rape in the second degree when he engages in sexual intercourse with another person when the other person is incapable of consent by reason of being mentally incapacitated."

Although the to-convict instruction properly states the intent element, the separation of the definition of second degree rape from the intent element creates an ambiguity. As discussed in the previous section, the State must prove that Kebede intended to have intercourse with an incapacitated person. But the jury could have read the instructions to require it to find only that Kebede intended to have intercourse with J.A. *when* she was incapacitated, without *believing* that she was incapacitated. Put another way, it is not clear from the instructions that Kebede must have intended to have intercourse with a person who he believed was incapacitated, and not just a person who *happens* to be incapacitated.

This analysis is consistent with our decision in In re Personal Restraint of Hubert, 138 Wn. App. 924, 158 P.3d 1282 (2007), an attempted second degree rape case where the victim was asleep and helpless, rather than incapacitated. Although that case considered whether defense counsel was ineffective for

9

failing to request an affirmative defense instruction, its analysis of the to-convict instruction is helpful. We explained:

> There is no intent element for rape. To commit an attempt, however, the defendant must intend to commit the crime charged. Here, that means the defendant must intend to have intercourse with a victim incapable of consent. The jury was so instructed. But this did not illuminate for the jury whether the defendant must be found to intend intercourse with a person he knows to be helpless, or merely intercourse with a person who happens to be helpless whether or not the defendant realizes it. The jury was unaware that if Hubert reasonably believed Wood had capacity to consent, his belief constituted a defense to the charge. The jury thus had no way to understand the legal significance of the evidence supporting the reasonableness of Hubert's belief that Wood was awake and capable of consenting to his advances. The attempt instruction does nothing to cure the absence of the reasonable belief instruction.

Hubert, 138 Wn. App. at 931-32 (footnote omitted). As in Hubert, the instructions here did not make clear to the jury that intending to have intercourse with a person who happens to be incapacitated is not sufficient to convict.

The State argues that Kebede's reliance on Hubert and Johnson is "out of context" because neither case reversed on the grounds of an instructional error. In Hubert, the issue was whether defense counsel was ineffective for failing to propose an affirmative defense instruction, and in Johnson, the issue was whether there was sufficient evidence to convict the defendant. While these cases may not constitute controlling authority on the propriety of the instruction given here, they are persuasive because they address what the State must prove and why the pattern instructions might be confusing. Therefore, the State's attempt to distinguish these cases is not persuasive.

Because the instruction was ambiguous, we must next consider whether the ambiguity was harmless. An omission or misstatement is harmless if it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. Nelson, 191 Wn.2d at 69.

During oral argument, the State argued that the ambiguity was harmless, and we agree that there was overwhelming evidence from which the jury could have found Kebede reasonably believed that J.A. was intoxicated and unable to consent. Although Kebede maintained J.A. was not drunk and did consent to intercourse, the evidence presented established that he intended to have intercourse with her while believing she was incapacitated such that any instructional ambiguity was harmless beyond a reasonable doubt.

For example, Kebede's own testimony is evidence that he intended to have intercourse with J.A. while she was obviously intoxicated. Kebede testified that he dropped off his last passenger at 1:46 a.m. and signed off of the Uber application. Kebede then picked J.A. up at 1:55 a.m. on Capitol Hill at a known party spot. Even though J.A. was trying to flag down a taxi in front of him, Kebede honked so that the taxi would drive off and J.A. would get into his car. Kebede explained that passengers who are drunk throw up, converse inappropriately, and complain that he is not going the right direction. Although he asserted that J.A. was not drunk, Kebede stated that once J.A. got in the car, she began "messing around" and telling him "'go straight. Go right. Go Left.'" He also said that although "99 percent [of passengers] are respectful and talk to you properly; she's above that." He testified that J.A. also sat in his front seat and

11

held his hand, whereas most customers sit in the back. Kebede then testified he followed J.A.'s nonsensical directions and drove northeast to Arboretum Park, which is in the opposite direction of J.A.'s alleged destination. J.A.'s failure to give accurate directions makes no sense if she were sober. When they stopped at the park, J.A. searched the car for her cell phone, even looking for it in his glove box (where it could not have been) and urinated in the nearby bushes. Furthermore, Kebede admitted that he thought J.A. had been drinking. Specifically, he testified that although he could not tell whether J.A. had any alcohol, he "guess[ed] maybe she had some." Previously, he told a detective that she was "tipsy."

Kebede's testimony describes the behavior of someone who was extremely intoxicated. Despite his self-serving statements that he did not believe J.A. was intoxicated, the rest of his testimony is evidence that he believed she was. This, combined with the fact that she was kicked out of the nightclub and had a large "X" on her hand, is overwhelming evidence that Kebede believed J.A. was intoxicated and unable to consent. Therefore, the trial court's failure to more clearly instruct the jury that it must find he intended to have intercourse with an incapacitated person was harmless beyond a reasonable doubt.

Kebede argues that the instructions were prejudicial because there was conflicting evidence about how drunk J.A. was and Kebede's own behavior was consistent with consent. We disagree.

First, Kebede places too much weight on the other club-goers' testimony. It is true that one of J.A.'s friends from that night testified that he told a detective

that J.A. "didn't sound crazy" that night. But when asked what he meant by "crazy," the witnesses stated, "She didn't seem—I mean, she seemed drunk, yes; but was she out of her mind, completely crazy, no. I've never seen—you don't see people like that. She wasn't on drugs or anything." Another witness reported that J.A. seemed "pretty normal" that night and he did not remember anyone "getting out of hand." But he also admitted that he "d[id]n't know [J.A.] well enough." Finally, a witness who was not drinking that night testified that she had a one minute conversation with J.A. after 10:30 p.m. and J.A. did not appear "wasted." But that witness also testified that she had no information about how intoxicated J.A. was later in the night when J.A. left the club. None of this testimony, when taken in context, directly conflicts with the other overwhelming evidence of J.A.'s obvious intoxication.

Second, Kebede's behavior was not consistent with consent. Although he stayed the night with J.A., let her use his phone, gave her a ride home, and later cooperated with police, the morning after the attempted rape, he lied to J.A., telling her that they met at a bar the night before, that he was not an Uber driver, and that they had sex. Presumably, he told these lies in order to conceal his activities from the previous night. Furthermore, Kebede's bold-faced lies indicate that he believed J.A. was too drunk to remember what happened. For these reasons, Kebede has not shown that he was prejudiced.

### Ineffective Assistance of Counsel

Kebede argues that defense counsel was ineffective for withdrawing a statutory affirmative defense instruction that the jury could acquit if he proved by

13

a preponderance of the evidence that he believed J.A. was not mentally incapacitated. We disagree.

To prevail on a claim of ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient and that the deficient performance prejudiced him. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). "Performance is deficient if it falls 'below an objective standard of reasonableness based on consideration of all the circumstances.'" State v. Estes, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017) (quoting McFarland, 127 Wn.2d at 334-35). There is a strong presumption that counsel's representation was reasonable and that performance is not deficient if counsel's conduct can be characterized as legitimate trial strategy or tactics. Estes, 188 Wn.2d at 458.

A defendant accused of second degree rape can raise an affirmative defense that "at the time of the offense the defendant reasonably believed that the victim was not mentally incapacitated." RCW 9A.44.030(1). The affirmative defense must be proved by a preponderance of the evidence. RCW 9A.44.030(1).

Here, defense counsel proposed an instruction on this affirmative defense but later requested that it be removed from the jury instructions. This decision was a legitimate trial strategy. The affirmative defense is available for the crime of second degree rape because that crime has no mens rea. But the affirmative defense is not necessary for the crime of attempted second degree rape because

14

the State must prove that the defendant intended to have intercourse with an incapacitated person, which necessitates a finding that the defendant believed the victim was incapacitated. Cf. Johnson, 173 Wn.2d at 907. In this circumstance, use of the affirmative defense would have shifted the burden from the State to Kebede to prove that he did not believe that J.A. was incapacitated. Because the State bore the burden to prove that Kebede believed J.A. was incapacitated beyond a reasonable doubt, defense counsel legitimately withdrew the affirmative defense instruction that would have shifted that burden of proof from the State to Kebede.

Kebede argues that Hubert requires reversal. There, the defendant was also charged with attempted second degree rape. Despite evidence that the defendant believed the victim consented to a sexual encounter, defense counsel did not argue that this constituted an affirmative defense or request an instruction on the affirmative defense. Hubert, 138 Wn. App. at 929. Defense counsel admitted that he failed to do so because he was not familiar with the defense. Hubert, 138 Wn. App. at 929. We held that defense counsel's performance was deficient. Hubert, 138 Wn. App. at 930. But Hubert was decided before Johnson clarified that the State must prove a higher mens rea for *attempted* second degree rape than for second degree rape. Furthermore, defense counsel in Hubert admitted that his failure to request the affirmative defense instruction was not a trial tactic. Here, defense counsel was very familiar with the affirmative defense and the holding in Johnson and made a strategic decision to leave the

15

burden of proving Kebede's belief of J.A.'s state of intoxication with the State. Hubert does not require reversal.

Kebede also cites State v. Powell, 150 Wn. App. 139, 206 P.3d 703 (2009), as requiring reversal. There, the defendant was charged with second degree rape, and the Court of Appeals held that defense counsel deficiently failed to request the affirmative defense instruction. Powell, 150 Wn. App. at 155. But here Kebede was charged with *attempted* second degree rape. As already explained, Johnson requires that the State prove Kebede intended to have intercourse with an incapacitated J.A. This is an additional mens rea element not found in second degree rape. Therefore, Kebede's counsel was not deficient in choosing to hold the State to its burden, rather than shift it to Kebede. Powell does not require reversal.

## Prosecutorial Misconduct

Kebede argues that the prosecutor committed reversible misconduct by repeatedly misstating the law in closing argument. We disagree.

"To prevail on a claim of prosecutorial misconduct, the defendant must establish 'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'" State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (internal quotation marks omitted) (quoting State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)). "A prosecuting attorney commits misconduct by misstating the law." State v. Allen, 182 Wn.2d 364, 373, 341 P.3d 268 (2015). But "[i]f the defendant did not object, he is deemed to have waived any error, unless the prosecutor's misconduct was

16

so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." State v. Whitaker, 6 Wn. App. 2d 1, 15-16, 429 P.3d 512 (2018), review granted, 193 Wn.2d 1012 (2019). "Under this heightened standard, the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" State v. Emery, 174 Wn.2d 741, 761, 278 P.3d 653 (2012) (quoting Thorgerson, 172 Wn.2d at 455).

Here, during closing argument, the prosecutor explained:

> So really, it will get down to these two questions, did the defendant take a substantial step towards committing the act of rape in the second degree. So what is rape in the second degree? How do you know if someone has the intent to commit rape in the second degree? Rape in the second degree is sexual intercourse with another person who was incapable of consent by reason of being mentally incapacitated.

She then argued that the jury needed to consider only two contested elements. For example, the prosecutor stated, "[c]urrently we're asking ourselves, did he try to have sex with her, and was she too drunk for him to be doing that; that's it. That's what it comes down to." Additionally, she stated that there was "compelling medical evidence that the defendant not only took that substantial step towards having sex with [J.A.], but that she also was incapable of consenting at the time and didn't consent." Later, the prosecutor stated, "[t]hose two aspects of this case are incredibly compelling . . .—did he try to have sex with her, was she too drunk to consent."

17

During these arguments, the prosecutor also argued that J.A.'s incapacitation was obvious: witness testimony highlighted "why it's so likely that [J.A.] was clearly incapable of consent that night" and testimony that J.A. was hanging onto her friends was evidence of her drunkenness that "would likely have been usable [sic] to Mr. Kebede." She also disagreed with Kebede's observations of J.A.'s sobriety:

> All the (inaudible) that you heard; oh, no, no, it's not because she's drunk, guys. She's not drunk even though every single sign points towards she is. It's 1:40 in the morning on Capitol Hill, a girl dressed up in party clothes, chowing down on some tacos at the taco stand, gets in the car, "let's go," starts swearing again, and grabs your hand and you're saying that girl's not drunk?
> Well, somehow, Mr. Kebede wanted you to believe that he is a great judge of character, and that's part of his job, and he can read people, and that's an important aspect of his career, and he can tell when people are drunk; but then when specifically asked about [J.A.], he won't commit. At first he wants to say, no, no I can't [tell] if she's drinking milk versus alcohol; but then when confronted, you actually did say she was drinking. You did say she was tipsy, and starts to start backpedaling. You saw that a lot throughout his testimony, a lot of backpedaling, a lot of excuses, explanations, not answering the direct question. It was clear [J.A.] was drunk, and he even said it to the detective, "She's tipsy."

Defense counsel did not object to any of the prosecutor's closing arguments. In his own closing argument, defense counsel argued that J.A. was not that drunk and highlighted testimony from J.A.'s friends at the club that she did not seem drunk. He also acknowledged that as argued by the prosecutor, consent is "the central issue in this case." In explaining the to-convict instruction, defense counsel correctly explained what the State must prove based on Johnson:

> So the State needs to prove beyond a reasonable doubt that Mr. Kebede knew [J.A.] was mentally incapacitated in order to be

able to prove intent; they have to prove he knew it. And the intent definition is instructed in Instruction 8. It's a very straightforward, "Acting with the objective or purpose to accomplish a result that constitutes a crime." What is his purpose? What was he trying to accomplish? Accomplishing a sexual act is not enough to constitute a crime. It has to be sex with a mentally incapacitated person, and they have to prove he knew it.

. . . And in order for him to have that specific intent, they have to prove he knew she was mentally incapacitated.

On rebuttal, the prosecutor again focused on J.A.'s incapacitation, arguing, "Remember there's the, did he try to have [sex] with her, and was she too drunk to consent is kind of what it comes down to." The prosecutor argued further, "it really comes down to was she too intoxicated to consent" and "really, it comes down to was she too drunk to have sex." But she also responded to defense counsel's argument that Kebede did not know J.A. was intoxicated:

you know she's drunk because it's 1:40 in the morning on Capitol Hill, because her friends say she was hanging onto a buddy for support, because she was acting erratic and unusual is far different than 99 percent of the people that he drove, because he said that almost always he's picking up drunk people, because he said that she was tipsy, because she's peeing on the side of a bush in front of a stranger, because she's acting disrespectful, mouthy, bossy, rude, because she can't remember where her phone is. She can't remember where her money is, she's searching on her hands and knees crawling in the back of the car, because she doesn't even know who that guy is when she wakes up. If all of those things can tell you that she was too drunk, and those were all of the bits of information that that man had.

Taken in context, the prosecutor's argument was not a misstatement of the law. Both in closing and rebuttal, the prosecutor explained that J.A.'s extreme intoxication was obvious and that Kebede's testimony to the contrary was not credible.

19

But even if the prosecutor's repeated focus on the substantial step and J.A.'s incapacitation was a misstatement of the law, these misstatements are not reversible misconduct because they could have been cured by an instruction to the jury. The trial court agreed that Johnson was applicable to this case. But during closing arguments, defense counsel did not object to the prosecutor's arguments or request that the trial court further instruct the jury or clarify the intent required under Johnson. Therefore, Kebede has not demonstrated that the prosecutor's statements were prejudicial. Cf. State v. Blizzard, 195 Wn. App. 717, 733, 381 P.3d 1241 (2016) ("A defendant who waits until appeal to raise misconduct arguments bears a heavy burden."), review denied, 187 Wn.2d 1012 (2017).

Kebede argues that the prosecutor's misstatement of the law could not have been cured by an instruction to the jury because the trial court "consistently refused to instruct the jury on the specific intent element" and the jury instructions were ambiguous. It is true that the trial court refused to give Kebede's proposed to-convict instruction, which required the State to prove that "the defendant knew [J.A.] was incapable of consent by reason of being mentally incapacitated." The trial court did so because it believed that the pattern instruction adequately stated the intent element, as required in Johnson, which it agreed was an accurate statement of the law. Therefore, it does not follow from the trial court's refusal to give defense counsel's proposed to-convict instruction that the court would also have refused to give an instruction to correct a misstatement of the law based on Johnson.

Kebede next cites In re Personal Restraint of Glasmann, 175 Wn.2d 696, 286 P.3d 673 (2012) (plurality opinion), to argue that the prosecutor's repeated misrepresentation of the law prejudiced him. But in Glasmann, the prosecutor improperly expressed his personal opinion of Glasmann's guilt. Glasmann, 175 Wn.2d at 706. Here, the prosecutor's argument was not an improper misstatement of the law. In fact, she argued during closing and rebuttal that J.A.'s level of intoxication was obvious and Kebede's testimony that she appeared sober was not credible. Therefore, reversal is not warranted.

## Exclusion of DNA Evidence

Kebede argues that the trial court denied his right to present a defense by excluding DNA evidence of J.A.'s additional sexual encounters under the rape shield statute. We disagree.

"'The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.'" State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010) (quoting Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)). But the right to present a defense is not absolute. Jones, 168 Wn.2d at 720. "Evidence that a defendant seeks to introduce 'must be of at least minimal relevance.'" Jones, 168 Wn.2d at 720 (quoting State v. Darden, 145 Wn.2d 612, 622, 41 P.3d 1189 (2002)). If the defendant seeks to admit relevant evidence, "the burden is on the State to show the evidence is so prejudicial as to disrupt the fairness of the fact-finding process at trial.'" Jones, 168 Wn.2d at 720 (quoting Darden, 145 Wn.2d at 622). "The State's interest in excluding prejudicial evidence must also

21

'be balanced against the defendant's need for the information sought,' and relevant information can be withheld only 'if the State's interest outweighs the defendant's need.'" Jones, 168 Wn.2d at 720 (quoting Darden, 145 Wn.2d at 622). "[F]or evidence of *high* probative value 'it appears no state interest can be compelling enough to preclude its introduction consistent with the Sixth Amendment and Const. art. 1, § 22.'" Jones, 168 Wn.2d at 720 (quoting State v. Hudlow, 99 Wn.2d 1, 16, 659 P.2d 514 (1983)).

The rape shield statute provides:

Evidence of the victim's past sexual behavior including but not limited to the victim's marital history, divorce history, or general reputation for promiscuity, nonchastity, or sexual mores contrary to community standards is inadmissible on the issue of credibility and is inadmissible to prove the victim's consent.

RCW 9A.44.020(2). The statute applies only to past sexual behavior and "was not designed to prevent defendants from testifying as to their version of events but was instead created to erase the misogynistic and antiquated notion that a woman's past sexual behavior somehow affected her credibility." Jones, 168 Wn.2d at 723.

In Jones, the defendant wanted to testify that his sexual contact with his niece was consensual and took place during an all-night sex party in which his niece engaged in consensual sex with two other men. Jones, 168 Wn.2d at 717. The trial court excluded the defendant's testimony under the rape shield statute. Jones, 168 Wn.2d at 717-18. The Supreme Court ultimately concluded that the rape shield statute did not apply because the excluded evidence referred to conduct on the night of the alleged rape, not to past sexual conduct. Jones, 168 Wn.2d at 723. It also concluded that the sex party evidence was the defendant's

"entire defense," and that "even if the rape shield statute *did* apply, the sex party testimony is of extremely high probative value and cannot be barred without violating the Sixth Amendment." Jones, 168 Wn.2d at 724.

Here, J.A. wore a one-piece swimsuit with a skirt over it on the night of the attempted rape. During her sexual assault exam, the nurse collected the swimsuit and obtained a perineal vulvar swab of J.A.'s person. A piece of the swimsuit's crotch and the swab were submitted for DNA testing. Testing of the perineal vulvar swab identified Kebede's DNA as well as a smaller amount of DNA from an unknown male, referred to as "Individual A." Testing of the swimsuit sample identified DNA from at least four male individuals, but due to the complexity of the mixture, no additional information could be obtained from it.

The State moved to exclude the DNA evidence from the swimsuit. In response, Kebede argued that the rape shield statute did not apply because there was "no reason to believe that the biological evidence was left behind at some point prior to the night in question" and, therefore, it was not evidence of past sexual behavior. Kebede also argued that the evidence was necessary to support his statement to police that J.A. smelled like she had sex already that night and to rebut the State's theory that he caused J.A.'s vaginal injuries. The trial court granted the motion to exclude the DNA evidence from the swimsuit, holding that it was "far less relevant" than the DNA evidence from Individual A, which was admitted, and that its probative value was far outweighed by the prejudice it would cause.

The trial court's decision did not violate Kebede's right to present a defense. The trial court admitted the DNA evidence from Individual A, which supported Kebede's theory that J.A. had sex earlier that night and that Individual A caused her vaginal injuries. In comparison, the swimsuit evidence was neither highly probative nor vital because no further information about how or when the DNA was left on the swimsuit could be obtained and the DNA from Individual A was admitted. Therefore, this case is distinguishable from Jones because the excluded evidence was not Kebede's entire defense.

Kebede argues that the State opened the door to the swimsuit DNA evidence during J.A.'s testimony and the trial court erred by denying his motion to admit it. "A party may open the door to otherwise inadmissible evidence by introducing evidence that must be rebutted in order to preserve fairness and determine the truth." State v. Wafford, 199 Wn. App. 32, 36-37, 397 P.3d 926, review denied, 189 Wn.2d 1014 (2017). "The decision to admit evidence lies within the sound discretion of the trial court and should not be overturned absent a manifest abuse of discretion." Wafford, 199 Wn. App. at 36.

Here, J.A. testified that she did not consent to having sex with Kebede and she "would never." She also testified that she told police that as a young girl in her early twenties, she did not need to go to a motel "to get laid," that she had never had a one-night stand, and that if she wanted to have one there were other age-appropriate peers at the nightclub she could have gone home with. Kebede then moved to admit the swimsuit DNA evidence, arguing it suggested that perhaps J.A. did have sex with an age-appropriate peer that night. The trial court

denied Kebede's motion, finding that although the prosecutor "got pretty close" to opening the door, the prejudice of the evidence far outweighed its probative value. When Kebede asked the court to reconsider its decision, the trial court declined, explaining that the swimsuit DNA evidence was not relevant because there was no information about when or how the DNA got onto the swimsuit.

The trial court did not abuse its discretion in denying Kebede's motion. Kebede was able to argue that J.A. had sex that night with Individual A. The swimsuit DNA evidence was highly prejudicial and of low probative value given the admission of the DNA of Individual A. Furthermore, in the absence of any evidence of how the DNA got onto the swimsuit, the swimsuit evidence was irrelevant to Kebede's theory because there was no way to tell whether the DNA was transferred during the night of the attempted rape or during a one-night stand, as Kebede suggested. Kebede's right to present a defense was not violated by its exclusion.

## Court Costs

Kebede challenges the imposition of $110 in court costs as part of his legal financial obligations, and the State concedes that the court costs must be struck from his judgment and sentence. We accept the State's concession.

RCW 10.01.160(3) prohibits trial courts from imposing costs on defendants who are indigent at the time of sentencing. This statute, amended effective June 7, 2018, applies prospectively to cases on direct appeal when the amendment was enacted. State v. Ramirez, 191 Wn.2d 732, 749, 426 P.3d 714 (2018).

Here, Kebede declared that he was indigent at the time of sentencing. His judgment and sentence was filed on September 14, 2017, and is still on direct appeal. Therefore, the costs must be struck from his judgment and sentence. We accept the State's concession and remand for the trial court to strike the court costs.

## SAG

Kebede filed a SAG that includes 15 numbered topics. We hold that none of them require reversal.

When considering issues raised in a SAG, we will consider only arguments that are not repetitive of briefing. RAP 10.10(a). We also will not consider a defendant's SAG if it does not inform the court of the nature and occurrence of the alleged errors. RAP 10.10(c); State v. Bluehorse, 159 Wn. App. 410, 436, 248 P.3d 537 (2011). We are not required to search the record in support of claims made in the SAG. RAP 10.10(c). Complaints about attorney performance cannot be entertained if the attorney's conduct "can be characterized as legitimate trial strategy or tactics." State v. McNeal, 145 Wn.2d 352, 362, 37 P.3d 280 (2002). "Finally, issues that involve facts or evidence not in the record are properly raised through a personal restraint petition, not a [SAG]." State v. Calvin, 176 Wn. App. 1, 26, 316 P.3d 496 (2013).

The first two issues Kebede raises are claims of ineffective assistance of counsel. They involve his attorney's failure to retest DNA evidence or investigate whether his police interview video was altered and his attorney's recommendation to proceed to a jury trial rather than a bench trial. All of these

decisions can be characterized as legitimate trial strategies. Therefore, reversal is not required. Kebede also claims that he was not given "items from the evidence." Although he includes page numbers for these items, he does not specify what they are, and it is impossible to determine what he is referring to. Because he has not properly identified the missing items, we need not reach this issue.

The third issue Kebede raises is a jury selection issue. Without any citation to the record, he states that five jurors were unfairly excused during voir dire and one biased juror was retained. Because he does not provide any citation to the record or identify the jurors by number, we need not consider this argument.

Issues 4 through 12 point out alleged inconsistencies in various witnesses' testimony. But "[c]redibility determinations are for the trier of fact and are not subject to review." State v. Thomas, 150 Wn.2d 821, 874, 83 P.3d 970 (2004). As determined above, sufficient evidence supported Kebede's conviction. His recitation of conflicting evidence does not warrant reversal.

Issues 13 and 14 involve the trial court. First, Kebede asserts that the trial court asked defense counsel if he was ready for trial and defense counsel said that he was not. It is unclear what error Kebede is alleging, and there is no citation to the record. Therefore, we need not review it. Kebede also alleges that he was disrespected because the prosecutor was smiling during trial, but he does not explain how this affected his trial. Kebede states that he could not understand most of the jury instructions and he could not see most of the

27

exhibits. His SAG does not indicate that he brought this to the attention of the court or alerted defense counsel. Therefore, he has waived any claim on this basis. Finally, Kebede claims that it was unfair that evidence that he tore J.A.'s clothes was admitted but the trial court excluded DNA evidence from J.A.'s swimsuit. As discussed above, the trial court did not abuse its discretion in excluding the swimsuit evidence. None of these issues require reversal.

Issue 15 includes errors Kebede accuses the prosecutor of making. First, he argues that she erred in stating that J.A.'s alcohol content was 1.5 times the legal limit because her blood alcohol level was measured at 0.00 during her sexual assault exam. But the alcohol in her urine was measured at 0.12, so the prosecutor's statement was not incorrect. Next, he claims that the prosecutor stood too close to the jury and influenced them by doing so. Because Kebede did not object to the prosecutor's positioning during trial, he has waived this argument on appeal. Finally, he asserts that the prosecutor failed to turn over the video of an interview J.A. gave to a news reporter. But the record indicates that the trial court denied Kebede's motion to subpoena the video from the news station and excluded the evidence. Therefore, the record does not support his argument that the State refused to give him the video.

Finally, in issue 16, Kebede contends that the police interview video was altered. Because this claim relies on evidence outside the record, we cannot consider it. See McFarland, 127 Wn.2d at 338 n.5 ("[A] personal restraint petition is the appropriate means of having the reviewing court consider matters outside the record.").

We affirm but remand for the trial court to strike Kebede's court costs from his judgment and sentence.

WE CONCUR: